## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EVEREST INDEMNITY INSURANCE
COMPANY,

      Plaintiff,

      v.

JAKE'S FIREWORKS, INC. and
HOWARD O. HARPER,

      Defendants.

MAXUM INDEMNITY COMPANY and
JAMES RIVER INSURANCE COMPANY,

      Intervenor Plaintiffs,

      v.

JAKE'S FIREWORKS, INC. and
HOWARD O. HARPER,

      Defendants.

Case No. 19-CV-2620-JAR-ADM

## MEMORANDUM AND ORDER

This matter concerns whether Defendant Jake's Fireworks, Inc. ("Jake's") has insurance

coverage for a state court lawsuit arising from a tragic accident on August 12, 2014, in which

Defendant Howard Harper ("Harper") was grievously injured.  Plaintiff Everest Indemnity

Insurance Company ("Everest") filed this action seeking a declaratory judgment, pursuant to 28

U.S.C. § 2201 and Fed. R. Civ. P. 56, that a commercial general-liability insurance policy it

issued to Jake's, Lone Star Management, LLC ("Lone Star"), and other entities does not provide

liability coverage for Harper's bodily injury claim and lawsuit filed against Jake's in the District

Court of Crawford County, Kansas.  Excess insurers Maxum Indemnity Company ("Maxum")

and James River Insurance Company ("James River") were granted leave to intervene in this

action and also seek declaratory judgment that they are not liable under commercial excess liability policies issued to Jake's.

This case is now before the Court on Everest's Motion for Summary Judgment (Doc. 19), James River's Motion for Summary Judgment (Doc. 87), Jake's Motion for Summary Judgment (Doc. 90), Maxum's Motion for Summary Judgment (Doc. 92), Harper's Motion for Summary Judgment (Doc. 95), Jake's Motion for Leave to File a Sur-Reply to Plaintiff Everest Indemnity Company's Reply in Support of its Motion for Summary Judgment (Doc. 94), and Jake's Objections to the Magistrate Judge's Order Denying Jake's Motion for Leave to Amend its Currently Pending Amended Answer and Counter-Claim to Plaintiff Everest's Complaint for Declaratory Judgment and Motion for Leave to Amend its Amended Answer and Counter-Claim to Intervenor Plaintiff Maxum Indemnity Company's Complaint for Declaratory Judgment (Doc. 100). The motions are fully briefed, and the Court is prepared to rule. For the reasons explained in detail below, Everest's, Maxum's, and James River's motions for summary judgment are granted, Jake's and Harper's motions for summary judgment are denied, and judgment is entered in favor of the insurers. Jake's motion for leave to file a sur-reply and objections the magistrate judge's order are denied as moot.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine [dispute] of material

---

[1] Fed. R. Civ. P. 56(a).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6]  To prevail on a motion for summary judgment on a claim upon which the moving party also bears the burden of proof at trial, the moving party must demonstrate that "no reasonable trier of fact could find other than for the moving party."[7]  A movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply "point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[8]

Once the movant has met its initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon its pleadings

---

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (emphasis omitted) (collecting cases).

[8] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[9] *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

to satisfy its burden.[10]   Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11]   In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[12]   If controverted, the facts are construed in the light most favorable to the non-movant.[13]   However, to successfully oppose summary judgment, the nonmovant must bring forward "more than a mere scintilla of evidence" in support of his position.[14]   A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[15]   "Where, as here, the parties file cross-motions for summary judgment, [the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[16]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[17]

---

[10] *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[11] *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see also Kannady,* 590 F.3d at 1169.

[12] *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co*., 968 F.2d 1022, 1024 (10th Cir. 1992)).

[13] *Frank v. U.S. W., Inc*., 3 F.3d 1357, 1361 (10th Cir. 1993) (citing *Anderson*, 477 U.S. at 255).

[14] *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993).

[15] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan*., 371 F.3d 1233, 1237 (10th Cir. 2004)).

[16] *James Barlow Family Ltd. P'ship v. David M Munson, Inc*., 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[17] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

II.     **Uncontroverted Facts**

Guided by the foregoing framework, the Court turns to the parties' statements of fact, keeping in mind that factual disputes about immaterial matters are not relevant to a summary judgment determination; rather, immaterial facts and factual averments not supported by the record are omitted.[18]

A.     **Relationship Between Jake's, Lone Star, and Harper**

Jake's and multiple other businesses, including Lone Star and Firework's Leasing, LLC ("Fireworks Leasing"), are owned and controlled by the Marietta Family. Jake's business involves the import, retail sale, and wholesale distribution of 1.4G consumer fireworks. Jake's corporate representative testified that the Marietta Family decided to form Lone Star for administrative efficiency in handling human resources functions for employees of Marietta-owned ventures. Thus, Lone Star was formed in November 2011 to employ the staff and "handle all the HR things, payroll, benefits, insurance, and then . . . lease out the employees back to the Marietta entities."[19] Lone Star has employees provided to work for Marietta-owned entities in several states across the country in addition to Kansas, including Washington, where Jake's operates a distribution center. Jake's corporate representative estimated in 2017 that Lone Star was leasing out approximately 200 workers in multiple states. Lone Star has never held itself out as a staffing agency to provide services to the general public.

On March 1, 2012, Jake's and Lone Star entered into a Staffing Services Agreement ("SSA").[20] The initial term of the SSA was for a period of one year, but the agreement provided that it would automatically renew unless either party provided written notice of termination

---

[18] *Frank*, 3 F.3d at 1361 (citing *Anderson*, 477 U.S. at 248).

[19] Baker Dep., Doc. 20-4 at 32:21−24.

[20] Doc. 20-4, Ex. 2 at 41−44.

within thirty days preceding the anniversary of its commencement.  The SSA provided that Jake's "wishes to contract with [Lone Star] for the providing [of] staff for management and services necessary to operate [Jake's] business.  [Lone Star] is willing and able to provide such staff for services as may be required by [Jake's.]"[21]

Per the SSA, Lone Star was responsible for handling wages, salaries, fringe benefits, employment taxes or assessments, and other human resources functions for the staff it provided to Jake's, including the provision of "all require[d] worker's compensation insurance, employee benefit coverage or any other required insurance coverage for all individuals performing staffing services to [Jake's]."[22]  The SSA required that Jake's

> pay [Lone Star] the sum of $1,000 per month plus the full amount of all gross wages, all employer contributions for employee benefit plans, social security, unemployment, Medicare and all contractor payments and salaries, if any, paid by [Lone Star] for all staff services provided to [Jake's] . . . .  Additionally, [Jake's] shall pay monthly three percent (3%) of all gross wages of staff services used by [Jake's] for the supervision and management of staffing personnel provided.[23]

Under "Relationship of the Parties," the SSA provided that Lone Star was "an independent contractor and not an agent, representative or employee of [Jake's]."[24]  The SSA further provided that the "cost, number, duration, and function of staffing personnel provided by [Lone Star] and used by [Jake's] shall be determined by [Jake's] in its sole discretion and approval at all times."[25]

Before Lone Star was founded in 2011, Harper had been an employee of Jake's for several years.  When Lone Star was formed, Harper became an employee of Lone Star and was

---

[21] *Id.* at 41.

[22] *Id.* at 42.

[23] *Id.* at 41.

[24] *Id.* at 43.

[25] *Id.* at 41.

leased back to Jake's under the terms of the SSA.  Jake's corporate representative testified that

Harper

> was leased to Jake's, so . . . control of all his work and whatever he
> did came through Jake's.  He was an employee before Lone Star
> took over, and he was in the warehouse and production  . . .
> working for Jake's until it turned over.  Nothing changed for those
> people except who wrote their paycheck and who covered their
> insurance.  [W]hat they did, who supervised them, what functions
> they performed, same as before, all for Jake's, so if the Mariettas
> directed [Harper] to do something, it would be through Jake's.[26]

While provided to work for Jake's, Harper primarily worked in production during the

busy season; during the off season, he would do "anything that [came] up."[27]  Harper testified

that his work varied from day to day and that he handled a variety of tasks, such as assembling

packages of fireworks, loading storage trailers with fireworks, taking inventory of fireworks in

storage, loading fireworks onto semitruck trailers for shipping, and cleaning the premises.  He

also testified that in addition to doing work for Jake's, he sometimes performed personal tasks

for at least one member of the Marietta Family, such as caring for dogs and cleaning out a

private garage.

### B.    Lone Star's Workers' Compensation Insurance Policy

Lone Star purchased a workers' compensation and employer's liability insurance policy

through Technology Insurance Company ("TIC"), Policy No. TARKS42414-02 ("TIC Policy").

Part I of that policy provides coverage for benefits paid under the workers' compensation laws of

several states, including Kansas.  Part II of the TIC Policy is titled "Employers Liability

Insurance" and states that, subject to certain exclusions, it provides coverage for "bodily injury

---

[26] Baker Dep., Doc. 20-4 at 53:17−54:3.

[27] Id. at 60:10.

by accident or bodily injury by disease . . . aris[ing] out of and in the course of the injured employee's employment by you."[28]

## C.     The Everest Commercial General Liability Insurance Policy

Everest issued to Jake's, Lone Star, and thirty-nine other entities and individuals, a commercial general liability insurance policy, Policy No. S18GL00320141, with effective dates of February 15, 2014 to February 15, 2015 ( "Everest Policy").  Jake's paid a premium of $209,800 for the Everest Policy, which Everest delivered to Jake's at Jake's headquarters in Pittsburg, Kansas.  Subject to certain provisions, conditions, definitions, limitations, and exclusions, the Everest Policy provided commercial general-liability insurance with a liability limit of $1,000,000 per occurrence.  The Everest Policy's "coverage territory" included the entire "United States of America . . . provided that the insured's responsibility to pay damages is determined in a 'suit' on the merits."[29]  Costs paid for the investigation and defense of a claim under the Everest Policy do not reduce the Policy's limits.

The Everest Policy contained the following provisions, among others:

> **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
> . . .
>
> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  The words "we", "us" and "our" refer to the company providing this insurance.
>
> The word "insured" means any person or organization qualifying as such under Section **II** — Who Is An Insured.
> . . .

---

[28] Doc. 109-1 at 11.

[29] Doc. 20-1 at 33.

**SECTION I — COVERAGES**

**COVERAGE A — BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.    Insuring Agreement**

　　a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

**SECTION II — WHO IS AN INSURED**

1.   If you are designated in the Declarations as:
. . .

　　c.   A limited liability company, you are an insured. . . .

　　d.   An organization other than a partnership, joint venture, or limited liability company, you are an insured. . . .
. . .

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**
. . .

**7.    Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

　　a.   As if each Named Insured were the only Named Insured; and

　　b.   Separately to each insured against whom claim is made or "suit" is brought.
. . .

**SECTION V — DEFINITIONS**

. . .

5.  "Employee" includes a "leased worker".  "Employee" does not include a "temporary worker".

. . .

10.  "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to provide duties related to the conduct of your business.  "Leased worker" does not include a "temporary worker".

. . .

19.  "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.[30]

Both Jake's and Lone Star are identified in the Declarations of the Everest Policy as named insureds, pursuant to Endorsement No. ILU 003 (0589), and are "insureds" under the Everest Policy.

Under **Section I, Coverage A**, the Everest Policy originally set forth following "Employer's Liability" exclusion, stating that the insurance did not apply to:

e.  **Employer's Liability**

"Bodily injury" to:

(1)  An "employee" of the insured arising out of in and in the course of:

(a)  Employment by the insured; or

(b)  Performing duties related to the conduct the insured's business; . . . .

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share

---

[30] *Id*. at 21-33.

Case 2:19-cv-02620-JAR-ADM   Document 117   Filed 11/19/20   Page 11 of 50

> damages with or repay someone else who must pay damages
> because of the injury. [31]
> . . .

*However*, per Endorsement ECG 21 740 09 11, that exclusion was deleted and replaced by the

following language ("EL Endorsement"), stating that the insurance does not apply to:

> "Bodily injury" to:
>
> (1)    Any "employee" of any insured, to any contractor hired or
> retained by or for any insured or any "employee" or sub-
> contractor of any such contractor for any claim arising out
> of and in the course of:
>
> > (a)    Employment or retention by or for any insured, any
> > contractor or any subcontractor; or
> >
> > (b)    Performing duties related to the conduct of any
> > insured's or any contractor or subcontractor's
> > business; . . . .
>
> This exclusion applies:
>
> (1)    Whether any insured, contractor or subcontractor may be
> liable as an employer or in any other capacity; and
>
> (2)    To any obligation to share damages with or repay someone
> else who must pay damages because of the injury.[32]

Thus, among other changes, the EL Endorsement changed the term "the insured" to "any

insured."

The Everest Policy also contained a Stop Gap Coverage Endorsement Provision ("Stop-

Gap Endorsement").  The Stop-Gap Endorsement provides, in part, that Everest:

> will pay those sums that the insured becomes legally obligated to
> pay as damages because of "bodily injury" to any of your
> "employees" that arises out of and in the course of employment by
> you, provided such "employee" is reported and declared under the
> Workers Compensation Fund of a state designated in the Schedule

---

[31] *Id.* at 22.

[32] *Id.* at 71.

of this endorsement.  The "bodily injury" must take place in the
coverage territory".  "Bodily injury" by accident must occur during
the policy period.  The last day of last exposure of an "employee"
to the conditions causing or aggravating "bodily injury" by disease
must occur during the policy period.[33]

Everest did not designate any particular state under whose workers' compensation laws Jake's

was to report and declare employees.  The paragraph of the Stop-Gap Endorsement in question

reads:

> Subject to the other provisions applicable to this endorsement, the
> insurance afforded by this endorsement will apply to your legal
> liability for "bodily injury" of any "employee" who is reported and
> declared under the "Workers' Compensation Law" of the state of
> _____, if that "employee"  is injured in the course of and
> arising out of their employment by you and if your legal liability is
> in lieu of or in addition to the liability under an applicable
> "Workers' Compensation Law".[34]

The Everest Policy's Coverage Part Schedule lists the premiums Jake's paid for different

classes of coverage.  For stop-gap coverage, the "Premium" box lists the amount of $400.00, and

the box titled "Location" is completed with the word, "ALL."[35]  On the Everest Policy's Final

Audit page, the stop-gap coverage is included in a list of coverages that apply in all states.[36]

Finally, the Stop-Gap Endorsement in the Everest Policy and the Employers Liability Insurance

provision in the TIC Policy issued to Lone Star have some similarities, including the types of

damages that will be paid and several exclusions from coverage.

---

[33] Doc. 20-1 at 67.

[34] *Id*. at 67.

[35] *Id*. at 19.

[36] *Id*. at 72.

**D.      The Maxum and James River Commercial Excess Liability
          Insurance Policies**

In addition to the Everest Policy, Jake's was issued two commercial excess liability

insurance policies.  Maxum issued the first-layer excess liability policy, Policy No. EXC

6018367-03, to Jake's as the Named Insured, with effective dates of February 15, 2014 to

February 15, 2015 ("Maxum Policy").  Maxum delivered the policy to Jake's at Jake's

headquarters in Pittsburg, Kansas.

The Maxum Policy states that "[t]hroughout this policy, the words 'you' and 'your' refer

to the Named Insured shown in the Declarations, and any other person qualifying as a Named

Insured under this policy," and defines "insured" to mean "any person or organization qualifying

as such under the controlling underlying insurance."[37]  In addition to Jake's, Lone Star is also an

"insured" under the Maxum Policy.  The Maxum Policy defines "controlling underlying

insurance" to mean "any policy of insurance or self-insurance listed in the Declaration under the

Schedule of 'controlling underling insurance.'"[38]  Terms "that are not defined under the [Maxum

Policy] but defined in the 'controlling underlying insurance' will have the meaning described in

the policy of 'controlling underlying insurance.'"[39]  Although the Maxum Policy Declarations

erroneously refer to a prior underlying insurer rather than Everest in the "Underlying Insurance"

section, no party disputes that the Everest Policy is the underlying insurance to the Maxum

Policy as it applies to this case.[40]

---

[37] Doc. 93-2 at 17.

[38] *Id.* at 21.

[39] *Id.* at 17.

[40] *See* Ames Aff., Doc. 93-2 at 3−4.

The Maxum Policy provides that it "will follow the same provisions, exclusions and limitations that are contained in the applicable 'controlling underlying insurance', unless otherwise directed by this insurance.  To the extent such provisions differ or conflict, the provisions of this Coverage Part will apply."[41]  With respect to exclusions, the Maxum Policy states that "the exclusions applicable to any 'controlling underlying insurance' apply to this insurance unless superseded by the following exclusions or superseded by any other exclusions added by endorsement to this Coverage Part."[42]  The Maxum Policy provides excess commercial liability insurance to Jake's—provided that the underlying Everest insurance would apply—with a limit of $5,000,000 for each occurrence and in the aggregate, but only for "ultimate net loss" in excess of the $1,000,000 "retained limit" in the Everest Policy.[43]

James River issued a second-layer excess insurance policy, Policy No. 00052017-2, to Jake's as the Named Insured, with effective dates of February 15, 2014 to February 15, 2015 ("James River Policy").  James River delivered the policy to Jake's at Jake's headquarters in Pittsburg, Kansas.

The James River Policy states that "[t]hroughout this policy, the words 'you' and 'your' refer the Named Insured shown in the Declarations and any other person or organization qualifying as an Insured under the 'underlying insurance'."[44]  The James River Policy defines "underlying insurance" as "[t]he policy or policies or self insurance listed in the Schedule of

---

[41] Doc. 93-2 at 17.

[42] *Id*. at 18.

[43] *Id*. at 13, 18.

[44] Doc. 88-1 at 7.

Underlying Insurance," which lists both the Everest and Maxum Policies.[45]  In addition to Jake's, Lone Star is an "insured" under the James River Policy.

The James River Policy states that it shall "follow the terms, definitions, conditions and exclusions of the scheduled 'underlying insurance(s)', subject to the policy period, policy limits, premiums and all other terms, definitions, conditions and exclusions of this policy.  If any provisions of the scheduled 'underlying insurance(s)' conflict with any provisions of this policy, the provisions of this policy will apply."[46]  The James River Policy provides excess liability insurance to Jake's with a limit of $5,000,000 each occurrence and in the aggregate—in excess of the $6,000,000 in underlying coverage from the Everest and Maxum Policies—provided that the underlying insurances would apply.[47]

### E.  August 12, 2014 Accident

In August 2014, Jake's was preparing to sub-let a commercial property located near the 69 Highway bypass in Pittsburg, Kansas ("Bypass Property") to DEPCO, an unrelated entity. Fireworks Leasing owned the Bypass Property and was leasing it to Jake's in August 2014, though Jake's had abandoned the property approximately two years earlier and was no longer using it for the storage of consumer fireworks in the regular course of business.  Jake's continued to make lease payments on the Bypass Property even after moving its operations elsewhere.  The work being performed at the Bypass Property in August 2014, including cleanup and remodeling, was in preparation for occupation by the new tenant.  As Jake's corporate representative explained, "Jake's leased the property from Fireworks Leasing.  Jake's was sub-

---

[45] *Id*. at 5−6, 9.

[46] *Id*. at 7.

[47] *Id*. at 2, 5−7.

leasing to DEPCO, so Jake's was responsible for cleaning up the property and getting it set for the new tenant."[48]

Jake's corporate representative also testified that warehouse workers such as Harper "do all sorts of things.  There's no specific job assignments or duties.  They do whatever they're told, including clean-up, remodeling, painting, moving."[49]  In preparation for Jake's sub-leasing the Bypass Property to DEPCO, Harper was "pulled over to the bypass to clean."[50]  Harper testified that at the direction of another employee, Scott Moutz,[51] he and a coworker went to the Bypass Property on multiple occasions in early August 2014 to assess what needed to be done; Harper and his coworker inventoried storage trailers to determine which materials could be salvaged and brought to Jake's new location to be sold, and which materials needed to be discarded.

On August 12, 2014, at Moutz's direction, Harper and his coworker were unloading and cleaning out a particular trailer that contained expired consumer fireworks, which were to be discarded.  Both the trailer and the fireworks belonged to Jake's.  As Harper's colleague was operating a liquid propane-powered forklift, which was also owned by Jake's, a fire started in the trailer and Harper was severely injured.  The cause of the fire, or what material may have ignited to start the fire, has never been conclusively determined.  Harper's injury occurred by accident, while he was employed by Lone Star, within the Everest Policy coverage territory, and within the Everest, Maxum, and James River Policy periods.

---

[48] Baker Dep., Doc. 20-4 at 46:23−47:1.

[49] *Id*. at 46:11−14.

[50] *Id*. at 60:12.

[51] Moutz's "primary job duty [was to] run[] production" for Jake's but, like Harper, Moutz was not employed by Jake's because Jake's has had no direct employees since Lone Star was formed.  *Id*. at 32:13−33:6, 44:23−25, 53:16−54:3.

**F.      State Court Litigation Arising from August 12, 2014 Accident**

Harper filed a workers' compensation claim against Lone Star, and Lone Star's workers' compensation insurer settled that claim.  On July 29, 2016, Harper filed a lawsuit against Jake's in state court for the burn injuries he sustained on August 12, 2014.  That action—styled *Howard Harper v. Jake's Fireworks., Inc*., Case Number 2016-CV-000086P, and pending in the District Court of Crawford County, Kansas—includes claims for negligence, negligence per se, premises-liability, and loss of services and consortium for Harper's wife ("State Court Action"). Harper claims damages in excess of $10,000,000 in the State Court Action, and Jake's is at risk of becoming legally obligated to pay damages because of Harper's injury, including damages that would be in excess of the retained limits of the Everest and Maxum Policies, if those policies were to apply.

Jake's made a tender of defense and indemnity to Everest under the Everest Policy, and also put Maxum and James River on notice of the State Court Action.  Everest has been and is currently providing Jake's a defense against Harper's State Court Action under a reservation of rights ("ROR").  In the ROR letter that Everest sent to Jake's on October 3, 2016, Everest cited the entire text of the EL Endorsement and expressly stated its position that Harper was an "employee" of Jake's because he was a "leased worker" and, therefore, coverage likely did not apply.[52]

---

[52] Doc. 72-2 at 4−5.  The Everest ROR letter also stated: "Please be advised that no actions taken by Everest during the investigation of this claim should be considered by anyone to be a waiver of any of Everest's rights and defenses under any applicable policy of insurance and under applicable law.  There may be other provisions of the policies of insurance Everest issued to Jake's Fireworks, though not cited herein, that preludes [sic] or bar coverage for the claims that have been asserted against Jake's Fireworks in the pending lawsuit.  Everest expressly reserves any and all rights and defenses it possesses under the policy of insurance and under applicable law."  *Id*. at 5−6.

On November 1, 2019, Maxum issued an ROR letter to Jake's, relying upon and reproducing in its entirety the Everest Policy's EL Endorsement, as incorporated by the Maxum Policy.  The Maxum ROR letter stated that under the EL Endorsement, coverage was precluded for

> bodily injury to any "employee" of Jake's Fireworks or any other
> insured; any contractor hired or retained by or for Jake's Fireworks
> or any insured; or to any "employee" or sub-contractor of any such
> contractor for any claim arising out of in in the course of: (a)
> employment or retention by or for Jake's Fireworks or any insured
> or (b) performing duties related to the conduct of Jake's Firework's
> business or the business of any other insured.  The term
> "employee" includes a "leased worker."[53]

The Maxum ROR letter then expressly stated that coverage was excluded because Harper was an employee of Lone Star, an insured, and also potentially because he was "leased worker" and therefore employee of Jake's.[54]  On June 2, 2020, James River notified Jake's that it was declining coverage for the State Court Action.

In the State Court Action, Jake's argued for summary judgment in its favor on the basis that it was Harper's "statutory employer" and, therefore, immune from civil suit under Kansas's workers' compensation scheme.  Harper argued that while he was acting in the course and scope of his employment for Lone Star at the time of his injury, he did not qualify as Jake's statutory employee under Kansas law.  The judge in that case issued a letter ruling on September 5, 2019, denying Jake's motion for summary judgment on the basis that disputed issues of material fact remained as to whether Harper was Jake's statutory employee at the time of his injury.[55]

---

[53] Doc. 93-3 at 63.

[54] *Id.* at 63−64.  The Maxum ROR letter further asserted that there might be other terms or provisions of the policy that precluded coverage, and that Maxum did not intend to waive any rights or defenses that Maxum might possess under the policy and applicable law.  *Id.* at 67−68.

[55] Doc. 107-1.

On October 9, 2019, Everest filed this declaratory judgment action seeking a declaration of its rights and obligations under the Everest Policy and raising three policy interpretations, discussed below, in support of its argument that it does not owe coverage. Maxum and James River moved to intervene, and their motions were granted on March 30 and May 28, 2020, respectively.

## III.  Discussion

### A.  The Parties' Positions

Everest, Maxum, and James River on one side, and Jake's and Harper on the other, have all filed cross-motions for summary judgment, each arguing that under the terms of the Everest Policy—and the excess policies, where applicable—summary judgment should be awarded in its favor. Everest, Maxum, and James River assert that coverage for the State Court Action is precluded under the Everest Policy's EL Endorsement because: (1) Harper was a "leased worker" and therefore an "employee" of Jake's, an insured under the Policy; (2) Harper was an "employee" of Lone Star, which was also an insured under the policy; and (3) Harper was an "employee" of Lone Star, a contractor hired by Jake's, an insured under the policy.

Jake's argues that coverage for the State Court Action is not precluded by the EL Endorsement, and that it has coverage under the Everest Policy's Stop-Gap Endorsement in any event. Jake's further asserts that: (1) Everest is estopped from arguing that the latter two policy interpretations preclude coverage because it failed to raise them in its ROR letter; (2) Maxum is estopped from advancing the third policy interpretation as a bar to coverage because it failed to raise it in its ROR letter; and (3) James River is estopped from denying coverage for any reason whatsoever because it did not issue a declination of coverage letter until June 2, 2020, nearly four years after Harper initiated the State Court Action.

Everest and Maxum rejoin that Jake's has waived its estoppel and stop-gap coverage arguments by failing to raise them as affirmative defenses in its answers and in its counterclaims to their complaints.  James River contends that Jake's cannot establish the elements of estoppel because, as an excess insurer, it had no immediate obligation to issue its coverage position, and because Jake's cannot establish prejudice by James River's silence.

Jake's filed a motion for leave to amend its answers and counterclaims to Everest's and Maxum's complaints to expressly add defenses based on estoppel and stop-gap coverage, which United States Magistrate Judge Angel D. Mitchell denied.[56]  Jake's has now filed objections to Judge Mitchell's order denying leave to amend, as well as a motion for leave to file a sur-reply addressing the estoppel and stop-gap coverage issues, both of which are opposed.  All of the insurers argue that stop-gap coverage does not apply.

For his part, in response to the insurers' summary judgment motions, Harper

> admits . . . that he was employed by Lone Star at the time of his
> injury, and that Lone Star appears to be a named insured on the
> Everest Policy.  To any extent that judgment would flow from
> those facts alone, Harper would concede judgment in Everest's
> favor on that narrow basis only.[57]

Harper argues against Everest's other two interpretations of the Everest Policy on the basis that he was not performing the business of Jake's at the time of his injury, and asserts that this Court should not decide issues pertaining to the nature of his employment because they have been or are being litigated in the State Court Action.  Harper further argues that his affirmative defenses

---

[56] Doc. 89.

[57] Doc. 63 at 14.  In fact, Harper admits in his Answer that because he "was an 'employee' of any insured (Lone Star), the 'Employer's Liability' exclusion applies to bar coverage for [his] injury claim."  Doc. 20-2 ¶ 31; Doc. 20-3 ¶ 31.  Jake's argues that these admissions by Harper are not binding upon it.

based on abstention doctrines, collateral estoppel, laches, and collusive joinder preclude summary judgment in the insurers' favor.

## B.   Kansas Contract Law

"A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits."[58]  "In Kansas, the construction of a contract is governed by the law of the state in which the contract was made."[59]  A contract is made where the last act necessary for its formation occurs.[60]  There appears to be no dispute here that the contracts at issue were made in Kansas and are to be interpreted under Kansas law.

Kansas law provides that the interpretation and legal effect of an insurance contract is a matter of law to be determined by the court.[61]  "In construing an insurance policy, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished."[62]  Kansas law requires the court to "consider the relevant provisions of an insurance policy together, rather than in isolation, and give them effect."[63]  And it is well established that "judicial interpretation should not render any [contract] term

---

[58] *Phila. Indem. Ins. Co. v. Kan. City Home Care, Inc.*, 139 F. Supp. 2d 1194, 1197 (D. Kan. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

[59] *Id.* (citing *Simms v. Metro. Life Ins. Co.,* 685 P.2d 321, 324 (Kan. Ct. App. 1984)).

[60] *See Found. Prop. Invs., LLC v. CTP, LLC*, 159 P.3d 1042, 1046 (Kan. Ct. App. 2007) (citation omitted).

[61] *Gerdes v. Am. Family Mut. Ins. Co.*, 713 F. Supp. 2d 1290, 1295 (D. Kan. 2010) (quoting *Goforth v. Franklin Life Ins. Co.*, 449 P.2d 477, 481 (Kan. 1969)); *Am. Media, Inc. v. Home Indem. Co.*, 658 P.2d 1015, 1018 (Kan. 1983).

[62] *Iron Horse Auto, Inc. v. Lititz Mut. Ins. Co.*, 156 P.3d 1221, 1225−26 (Kan. 2007) (citing *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792 (Kan. 2002)); *see also Magnus, Inc. v. Diamond State Ins. Co.*, 101 F. Supp. 3d 1046, 1054 (D. Kan. 2015) (citing *Brumley v. Lee*, 963 P.2d 1224, 1226 (Kan. 1998)).

[63] *U.S. Specialty Ins. Co. Inc. v. Steele*, 458 F. Supp. 3d 1310, 1315 (D. Kan. 2020) (first citing *Brumley*, 963 P.2d at 1226; then citing *Hernandez v. Elec. Ins. Co.*, No. 15-1170-JTM, 2015 WL 7274038, at *4 (D. Kan. Nov. 17, 2015), *aff'd*, 659 F. App'x 500 (10th Cir. 2016)).

meaningless."[64]   Regarding endorsements to an insurance policy, "the endorsement and the policy must be read together.  The policy remains in full force and effect except as altered by the words of the endorsement.  Conversely, the endorsement modifies, to the extent of the endorsement, the terms and conditions of the original insurance contract."[65]

An insurer has a "duty to define limitations to an insured's coverage in clear and explicit terms.  To restrict or limit coverage, an insurer must use clear and unambiguous language."[66]  If the policy language is clear and unambiguous, the court must interpret it in its "plain, ordinary, and popular sense," and "enforce the contract as made."[67]  A policy is ambiguous "when it contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language."[68]  An insurance policy is not ambiguous merely because the parties disagree as to its interpretation.[69]  Rather, ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning."[70]  Whether policy language is ambiguous is a question of law, and the proper test is "not what the insurer intends the language to mean, but what a

---

[64] *LDF Food Grp., Inc. v. Liberty Mut. Fire Ins. Co.*, 146 P.3d 1088, 1095 (Kan. Ct. App. 2006) (first citing *Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 130 (Kan. 2003); then citing *Farm Bureau Mut. Ins. Co. v. Horinek*, 660 P.2d 1374, 1378 (Kan. 1983)).

[65] *Ashton v. Nat'l Farmers Unions Prop. & Cas. Co.*, No. 11-4002-SAC, 2012 WL 2814129, at *7 (D. Kan. July 10, 2012) (quoting *Thornburg v. Schweitzer*, 240 P.3d 969, 976 (Kan. Ct. App. 2010)).

[66] *Kemper Ins. Cos. v. Weber*, 168 P.3d 607, 611 (Kan. Ct. App. 2007).

[67] *O'Bryan*, 56 P.3d at 792 (citing *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998); then citing *Patrons Mut. Ins. Ass'n v. Harmon*, 732 P.2d 741, 746 (Kan. 1987)); *see also Magnus*, 101 F. Supp. 3d at 1054.

[68] *Kemper Ins. Cos.*, 168 P.3d at 610 (first citing *Marshall*, 73 P.3d 120, 130; then citing *Jones v. Reliable Sec., Inc.*, 28 P.3d 1051, 1059 (Kan. 2011)).

[69] *Id.* at 611 (citations omitted).

[70] *Am. Family Mut. Ins. Co. v. Wilkins*, 179 P.3d 1104, 1109–10 (Kan. 2008) (quoting *O'Bryan*, 56 P.3d at 793).

reasonably prudent insured would understand the language to mean."[71]  If the policy language is ambiguous, then it must be liberally construed in favor of the insured.[72]

"The insured has the burden to prove coverage under the policy.  The insurance company has the duty to show that a specific provision of the policy excludes coverage." [73]

C.  **Is the EL Endorsement Ambiguous Due to its Use of the Term "Any Insured" and the Conjunction "Or," and/or When Read in Conjunction with the Everest Policy's Separation-of Insureds Clause?**

The only interpretation of the Everest Policy advanced by the insurers that is not subject to Everest, Maxum, and Jake's competing estoppel and waiver arguments is that Harper was a "leased worker" and therefore an "employee" of Jake's, and was performing work related to the conduct of Jake's business at the time of his injury, thereby precluding coverage under the EL Endorsement.  Jake's and Harper argue that the EL Endorsement is rendered ambiguous by its use of the term "any insured" and the conjunction "or," as well as by the Everest Policy's separation-of-insureds clause.  They contend that because Everest attempted to restrict and limit coverage through the EL Endorsement, Everest's failure to use clear and unambiguous language, combined with the fact that the terms of the Everest Policy are uncertain, conflicting, or susceptible to more than one interpretation, means that the exclusion must be construed against Everest and in favor of Jake's.  In fact, Jake's at times appears to argue that the Policy's ambiguity requires more than that the EL Endorsement be given the construction most favorable to the insured by contending that it should have no effect at all.  The insurers counter that the EL

---

[71] *Id.* at 1110 (quotation omitted).

[72] *Magnus*, 101 F. Supp. 3d at 1054 (citing *Brumley v. Lee*, 963 P.2d 1224, 1226 (Kan. 1998)); *O'Bryan*, 56 P.3d at 793 (first citing *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992), *aff'd* 840 P.2d 456 (Kan. 1992); then citing *Patrons*, 732 P.2d at 746).

[73] *Cincinnati Ins. Co. v. Gage Ctr. Dental Grp., P.A.*, No. 12-2387-KHV, 2013 WL 5913751, at *9 (D. Kan. Nov. 1, 2013) (citing *Shelter Mut. Ins. Co. v. Williams,* 804 P.2d 1374, 1383 (Kan. 1991)).

Endorsement is clear and unambiguous, and that even if it must be given its narrowest construction due to the Everest Policy's separation-of-insureds clause, it still precludes coverage for Harper's injury.

The Everest Policy originally included an employer's liability exclusion that used the term "the insured" rather than "any insured," stating that coverage was excluded for "[b]odily injury" to "[a]n 'employee' of *the* insured arising out of in an in the course of . . . [e]mployment by *the* insured; or [p]erforming duties related to the conduct *the* insured's business . . . ."[74]  Per Endorsement ECG 21 740 09 11, however, that exclusion was expanded to provide instead that coverage was excluded for "[b]odily injury" to

> [a]ny "employee" of *any* insured, to any contractor hired or retained by or for *any* insured or to any "employee" or sub-contractor of any such contractor for any claim arising out of in and in the course of . . . [e]mployment or retention by or for *any* insured, any contractor or any subcontractor; or . . . [p]erforming duties related to the conduct of *any* insured's or any contractor or subcontractor's business . . . .[75]

Relying on the Kansas Supreme Court's decision in *Brumley v. Lee*,[76] as well as this Court's recent decision in *Auto Club Family Insurance Co. v. Moroney*,[77] Jake's argues that the use of the term "any insured" in the EL Endorsement renders the exclusion ambiguous, and that Jake's is therefore entitled to summary judgment as a matter of law that coverage is not excluded. Jake's further argues that the EL Endorsement's use of the conjunction "or" ten times to expand the exclusion to many different scenarios further compounds its ambiguity, as does the Policy's separation-of-insureds provision.

---

[74] Doc. 20-1 at 22 (emphasis added).

[75] *Id.* at 71 (emphasis added).

[76] 963 P.2d 1224 (Kan. 1998).

[77] No. 2:16-cv-02789-JAR-JPO, 2018 WL 898741 (D. Kan. Feb. 15, 2018).

In *Brumley*, the parents of a young child brought a wrongful-death claim against a caregiver, David Lee, and his wife after the child suffered fatal injuries in their care.[78]  Lee filed a third-party petition against the insurer of his home, seeking indemnification.[79]  Although Lee's wife inflicted the fatal blow, the child's parents alleged that Lee acted negligently in allowing her to do so.[80]  Lee's insurance policy had an intentional-act exclusion stating that the policy did not cover bodily injury or property damage "which [was] expected or intended by *any insured*."[81]  The policy also had a severability clause, which stated "[t]his insurance applies separately to each insured."[82]  The insurance company argued that coverage was excluded because Lee's wife was "any insured" and had intentionally harmed the child.[83]  But the child's parents argued that the severability clause rendered the language "any insured" ambiguous, and that the policy should therefore be construed in favor of coverage.[84]

On appeal from judgment in favor of the insurer, the Kansas Supreme Court found that that *Catholic Diocese of Dodge City v. Raymer*[85] controlled the matter before it.[86]  In *Raymer*, homeowners sought coverage for the intentional act of their child under a policy that precluded coverage for damages caused intentionally by "an insured."[87]  The Kansas Court of Appeals adopted a broad definition of both "an insured" and "any insured," finding that those terms refer

---

[78] *Brumley*, 963 P.2d at 1226.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 1227 (emphasis added).

[82] *Id.* (emphasis omitted).

[83] *Id.* at 1226.

[84] *Id.* at 1227.

[85] 825 P.2d 1144 (Kan. Ct. App.), *aff'd* 840 P.2d 456 (Kan. 1992).

[86] *Brumley*, 963 P.2d at 1227.

[87] *Raymer*, 825 P.2d at 1146.

to "any and all insureds under the policy, not just 'the insured' seeking coverage."[88]   However, the court ultimately found that the insurer's "insertion into the policy of a severability of interest clause ma[de] ambiguous the otherwise unambiguous language of the exclusion for intentional acts by an insured," and ruled in favor of coverage.[89]

In *Brumley*, then, the Kansas Supreme Court stated that "the words 'an' and 'any' are inherently indefinite and ambiguous,"[90] and that the ambiguity of the term "any insured" in the policy exclusion for intentional acts was more obvious when read in conjunction with the policy's severability clause.[91]   The effect of the severability clause was that each insured essentially had his or her own policy.[92]   The court noted that the policy's severability clause would ordinarily cause the exclusion to apply only against the individual insured for whom coverage was sought, but in view of its finding that the word "any" was ambiguous, found that the insurance company's attempt to expand the exclusion by using the term "any insured" rendered the entire clause ambiguous and construed it in favor of coverage.[93]

In *Auto Club*, this Court relied on *Raymer* and *Brumley* in finding similar ambiguity in a homeowner's insurance policy exclusion when combined with a separation-of-insureds provision.   In that case, the heirs of a man killed by an intoxicated, minor driver filed suit against the driver and his parents, claiming damages arising from the parents' alleged negligent entrustment of the vehicle to their son.[94]   The homeowner's policy at issue included both parents

---

[88] *Id.* at 1148 (collecting cases).

[89] *Id.* at 1151.

[90] *Brumley*, 963 P.2d at 1227.

[91] *Id.* at 1228.

[92] *Id.*

[93] *Id.*

[94] *Auto Club Family Ins. Co. v. Moroney*, No. 2:16-cv-02789-JAR-JPO, 2018 WL 898741, at *2 (D. Kan. Feb. 15, 2018).

and son as insureds, and a negligent-entrustment exclusion providing that the insurer would not cover "bodily injury or property damage arising out of any insured's . . . entrustment to any other person . . . of any motorized vehicle."[95]   The policy also included a severability clause providing that "[t]his insurance applies separately to each insured," meaning that each insured effectively had his or her own policy.[96]   However, the severability clause further defined "any insured" by stating that "[a]ny limiting or exclusionary provision in the policy indicating that it applies to 'any insured' means that such limiting or exclusionary provision is applicable as to any insured under this policy."[97]

In granting summary judgment in favor of coverage, this Court noted the *Brumley* holding regarding the ambiguity of the phrase "any insured" in the context of an intentional acts exclusion, and stated that "[i]n construing the meaning of 'any other person' opposite 'any insured,' . . . it is not immediately clear whether 'any other person' includes other insureds or not."[98]   Interpreting the policy as a whole, the Court found that the severability clause introduced additional confusion about the meaning of the terms "any insured" and "any other person" in the negligent-entrustment exclusion, particularly in light of its expanded definition of "any insured"—by broadening the scope of "any insured," the clause narrowed the meaning of "any other person" in the negligent-entrustment exclusion, making it logical to interpret the latter term as *not* including anyone insured under the policy.[99]   Because the negligent-entrustment

---

[95] *Id*. at *3.

[96] *Id*. at *4, 6.

[97] *Id*. at *4.

[98] *Id*. at *5.

[99] *Id*. at *7.

provision was ambiguous in the context of the entire policy and as applied to the facts, the Court construed the policy to provide coverage.[100]

It would go too far for this Court to hold that *Brumley* stands for the proposition that the term "any insured" is ambiguous each and every time it is used and in all contexts.  As the Tenth Circuit has stated,

> in asking whether or not an ambiguity exists, our analysis does not turn on whether a word *could* be used ambiguously, or *has* been used ambiguously in other contexts.  Rather, we must ask whether the word *is* used ambiguously within the actual contractual context in which it appears.  After all, when interpreting a contract or statute, we derive meaning not just from abstract words in isolation, but from their context and from the document as a whole.[101]

As many courts have recognized, the type of policy at issue here

> is not an employers' liability policy or a worker's compensation policy; rather, it is a commercial general-liability policy, and "[u]nlike worker's compensation insurance or employers' liability insurance, which exist to provide employers with coverage for injuries that occur to employees during the scope of employment, the sole purpose of commercial general liability insurance is to provide coverage for injuries that occur to the public-at-large."[102]

The purpose of an employer's liability exclusion in a commercial general-liability policy is to make clear that the only coverage intended is for liability to the general public, not employees.[103] This case is therefore unlike *Brumley* and *Auto Club*, in that the EL Endorsement excludes

---

[100] *Id.*

[101] *Payless Shoesource, Inc. v. Travelers Cos., Inc.*, 585 F.3d 1366, 1374 (10th Cir. 2009) (citations omitted).

[102] *LM Ins. Corp. v. Criss for Estate of Szuhay*, 716 F. App'x 530, 534 (6th Cir. 2017) (quoting *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 763 (6th Cir. 2014)); *see also, e.g., Hanover Ins. Co. v. Jones*, 979 F. Supp. 2d 1210, 1217 (D. Kan. 2013) ("The CGL Policy is designed to protect [the insured] from liability for injuries to third parties and is not designed to protect . . . for lawsuits by employees.").

[103] *See, e.g., Scottsdale Ins. Co. v. GFM Operations, Inc.*, 789 F. Supp. 2d 1278, 1288 (S.D. Fla. 2011) (explaining that purpose of employer's liability exclusion is to make clear that the only coverage intended is for liability to the general public, not employees) (citation omitted)).

28

coverage for bodily injury to an entire class of persons regardless of the theory of liability; there is no question here regarding what "any insured" means in the context of an intentional-act exclusion or when that term is juxtaposed with the phrase "any other person" in a negligent-entrustment exclusion.

Further, the Court cannot find that the use of the term "any insured" in the EL Endorsement—standing alone—is ambiguous merely because there are many insureds or because the exclusion uses the conjunctive "or" multiple times, resulting in the exclusion's application to bodily injury to any employee, contractor, or employee or subcontractor of such a contractor, hired by or for any insured to perform duties related to the conduct of any insured's business. The exclusion is not so broad as to make it ambiguous or to render coverage illusory; rather, the exclusion makes sense given the purpose to be accomplished by the commercial general-liability policy at issue.[104]   Under Kansas law, "'an insured' or 'any insured' refers to any and all insureds under the policy,"[105] which here encompasses both Jake's and Lone Star.

However, the Court must also consider the effect of the Everest Policy's separation-of-insureds (or severability-of-interests) clause. Though Everest apparently intended to preclude coverage for bodily injury to any employee (or contractor, subcontractor, or employee of a contractor or subcontractor) of any one of the forty-one insureds under the policy, the separation-of-insureds clause states that the insurance applies: (1) "As if each Named Insured were the only

---

[104] *See generally, e.g., Atl. Ave. Assocs. v. Cent. Sols., Inc.*, 24 P.3d 188, 191−92 (Kan. Ct. App. 2001) (rejecting insured's argument that definition of "pollutants" was so broad as to render pollution exclusion ambiguous); *Safeco Ins. Co. of Am. v. Mares*, 71 F. App'x 808, 812 (10th Cir. 2003) (finding, under New Mexico law, that exclusion was "not so broad or nebulous that it swallows and effectively nullifies a broad insuring clause"); *Nat'l Cas. Co. v. Young*, No. 07-cv-4836, 2009 WL 2170105, at *6 (E.D. Pa. July 17, 2009) ("Contrary to Defendant's position, a broad contractual provision does not mean that the provision is ambiguous.") (citations omitted)).

[105] *Catholic Diocese of Dodge City v. Raymer*, 825 P.2d 1144, 1148 (Kan. Ct. App.), *aff'd* 840 P.2d 456 (Kan. 1992) (collecting cases); *see also Pink Cadillac Bar & Grill, Inc. v. U.S. Fidelity & Guar. Co.*, 925 P.2d 452, 458 (Kan. Ct. App. 1996).

Named Insured"; and (2) "Separately to each insured against whom claim is made or "suit" is brought."[106]

The insurers point out that the Everest Policy's employer's liability exclusion would have used the term "the insured," but that the EL Endorsement altered that term to "any insured." They argue that courts in other states have held that the use of "any insured" rather than "the insured" in an exclusion "should be read to supersede the separation of insureds language in order both to effectuate [the exclusion's] plain meaning, and to avoid rendering the clause a nullity."[107]  In fact, "[t]his reading . . . is in agreement with the majority of cases that have analyzed an exclusion using the language 'any insured' in conjunction with a separation of insureds clause."[108]   It is true that the Kansas Supreme Court, prior to *Brumley*, noted that the term "the insured" is "obviously . . . not the same as 'named insured' or 'any insured.'"[109] However, the parties have not cited and the Court has not identified any Kansas authority holding that a change from "the insured" to "any insured" in a coverage exclusion should be read to supersede a severability clause, and *Brumley* would seem to require the opposite result. Having found that the EL Endorsement is not ambiguous when considered on its own—but taking into account the *Brumley* holding—the Court assumes without deciding that the combination of the term "any insured" in the EL Endorsement with the Policy's separation-of-

---

[106] Doc. 20-1 at 33.

[107] *Nautilus Ins. Co. v. Barfield Realty Corp.*, No. 11-cv-7425 (JPO), 2012 WL 4889280, at *10 (S.D.N.Y. Oct. 16, 2012) (citations omitted); *see also, e.g., Petrozziello v. Thermadyne Holdings Corp.*, 211 So.3d 1199, 1203 (La. Ct. App. 2017); *Am. Nat. Prop. & Cas. Co. v. Clendenen*, 793 S.E.2d 899, 917−18 (W. Va. 2016); *Am. Fam. Mut. Ins. Co. v. Wheeler*, 842 N.W.2d 100, 104−108 (Neb. 2014); *Nautilus Ins. Co v. K. Smith Builders, Ltd.*, 725 F. Supp. 2d 1219, 1229−30 (D. Haw. 2010); *Evanston Ins. Co. v. OEA, Inc.*, Nos. CIVS02-1505DFL PAN, CIVS02-1981DFL PAN, 2005 WL 1828796, at *8 (E.D. Cal. July 25, 2005); *BP Am., Inc. v. State Auto Prop. & Cas. Ins. Co.*, 148 P.3d 832, 839−42 (Okla. 2005).

[108] *Evanston Ins. Co.*, 2005 WL 1828796, at *8 (collecting cases); *see also Brumley v. Lee*, 963 P.2d 1224, 1234−36 (Kan. 1998) (Six, J., dissenting).

[109] *Rose Constr. Co., Inc. v. Gravatt*, 642 P.2d 569, 571 (Kan. 1982).

insureds clause creates ambiguity about the circumstances under which the EL Endorsement will apply.

While a policy that is rendered ambiguous due to provisions with doubtful or conflicting meaning must be given the construction most favorable to the insured,[110] Jake's initially does not articulate what construction of the EL Endorsement would result in coverage other than to imply that it should have no effect at all.  In a later portion of its briefing, Jake's acknowledges that "[a]pplying the Separation of Insureds provision  . . . , Jake's is to be treated as the only insured under the Policy for purposes of determining whether the Employer's Liability Exclusion bars coverage to Jake's for the State Court Action"[111] a position with which both Harper and this Court agree.[112]

The Court finds that a reasonable person in the position of the insured would have understood the language of the Everest Policy's EL Endorsement to have its narrowest construction when read with the separation-of-insureds provision.  Thus, adhering to *Brumley's* holding that a severability clause means that each insured has his or her own policy, and in the context of Harper's claim against Jake's, the EL Endorsement provides *only* that there is no coverage only for "bodily injury" to:

> (1)   Any "employee" of [Jake's], to any contractor hired or retained by or for [Jake's] or any "employee" or sub-contractor of any such contractor for any claim arising out of and in the course of:
>
> > (a)   Employment or retention by or for [Jake's], any contractor or any subcontractor; or

---

[110] *Brumley*, 963 P.2d at 1227.

[111] Doc. 72 at 43−44; *see also* Doc. 103 at 52; Doc. 110 at 64−65.

[112] Doc. 107 at 42 ("Liberally construing the language in favor of Jake's results in the 'any insured' language applying to just a single insured—**the** insured Jake's."); see *also* Doc. 102 at 24.

> (b)     Performing duties related to the conduct of [Jake's] or
> any contractor or subcontractor's business . . . .

Under this narrow construction, if Harper qualifies as Jake's "employee" because he was its

"leased worker," and his injury arose out of and in the course of performing duties related to the

conduct of Jake's business, then the exclusion applies to preclude coverage.[113]

### D.    Does the EL Endorsement Apply to Bar Coverage for the State Court Action on the Facts of this Case?

#### 1.    Does Harper Qualify as a "Leased Worker" and Therefore an "Employee" of Jake's?

There is no dispute that Harper was an employee of Lone Star, but the parties disagree on

whether Harper qualifies as Jake's "employee" within the meaning of the Everest Policy.  The

Policy provides that the term "employee" includes a "leased worker."[114]  "Leased worker," in

turn, is defined to mean "a person leased to you by a labor leasing firm under an agreement

between you and the labor leasing firm, to provide duties related to the conduct of your business.

'Leased worker' does not include a 'temporary worker.'"[115]  Jake's primary argument that

Harper was not Jake's "employee" is that he cannot qualify as a "leased worker" because Lone

Star is not a "labor leasing firm," which is not a defined term in the Everest Policy.

Jake's contends that because Lone Star was created by the Marietta family to provide

workers only to family-owned businesses and does not hold itself out to the public as a labor

leasing firm, a reasonably prudent insured would not understand Lone Star to qualify as a "labor

---

[113] Under this construction, the exclusion would not apply to employees of Lone Star injured while performing duties related to Lone Star's business.  The exclusion would apply, however, if Harper was an employee of any contractor hired by or for Jake's, and the insurers argue that Lone Star qualifies as Jake's contractor.  Because this interpretation of the Everest Policy is subject to the parties' competing estoppel arguments, among others, the Court considers first whether Harper qualifies as an employee of Jake's.

[114] Doc. 20-1 at 33.

[115] *Id*. at 34.

leasing firm" under the Everest Policy.  In support of this argument, Jake's relies on several cases addressing the meaning of the term "labor leasing firm" when it is undefined in the insurance contract at issue.  However, the cases Jake's relies upon are either distinguishable or ultimately unhelpful to its position.

For example, in *JNJ Logistics, L.L.C. v. Scottsdale Ins. Co*., JNJ Express ("Express"), a long-haul trucking company, provided one of its drivers to JNJ Logistics ("Logistics"), which provided local hostling services, for seasonal work.[116]  The worker, Grove, was injured while performing hostling services for a client of Logistics.[117]  Express and Logistics had the same ownership, and while Grove was performing hostling work for Logistics, his wages were paid by Express—Logistics later repaid those wages plus a fee to Express in an "intercompany settle-up."[118]  The owner of both companies testified that "Grove was hired by JNJ Express and worked at JNJ Logistics through an agreement between the two companies, not through an agreement between JNJ Logistics and a labor-leasing firm."[119]  Thus, the court found that Grove was not a "leaser worker."[120]  *JNJ Logistics* is distinguishable from this case in that Express did not exist for the purpose of placing its employees at client companies; rather, Express was a trucking firm that temporarily provided one of its employees to another firm under common ownership.

Similarly, in *Telamon Corp. v. Charter Oak Fire Insurance Co*., the Seventh Circuit found that the company through which the insured obtained a worker's services was not a "labor

---

[116] No. 2:10-cv-02741-JPM-cgc, 2013 WL 6903937, at *4−6 (W.D. Tenn. Dec. 31, 2013).

[117] *Id*. at *1.

[118] *Id*. at *4−6.

[119] *Id* at *15.

[120] *Id*.

leasing firm."[121]  In that case, Telamon engaged Juanita Berry to work for it through a series of

consulting agreements with J. Starr Communications, which was "Berry's one-woman company

through which she provided her services."[122]  After discovering that Berry had embezzled a large

sum, Telamon sought to recover under an insurance policy covering theft by "employees,"

including "leased workers" leased from a "labor leasing firm."[123]  The court accepted Telamon's

definition of a "labor leasing firm" as one that places its employees at client companies for a fee,

but held that "J. Starr was not a firm in the business of leasing labor; it was just Berry's vehicle

for providing her own services.  To classify her corporate alter ego as a 'labor leasing firm'

would be to elevate form over substance."[124]  *Telamon* is plainly distinguishable from the present

matter, where Lone Star employed hundreds of people and leased them to client companies while

maintaining the rights and obligations of an employer.

The foregoing cases support the concept that a labor leasing firm is an entity "in the

business of placing its employees at client companies for varying lengths of time in exchange for

a fee."[125]  A "labor leasing firm" generally "retain[s] the rights and obligations of an employer—

including determining rate of pay, procuring workers' compensation insurance and processing

payroll—while the client company direct[s] the employees daily activities."[126]  In this action, the

facts are that under the SSA, Lone Star was responsible for handling wages, benefits,

employment taxes, and other human resources functions for the staff it provided to Jake's,

---

[121] 850 F.3d 866, 870 (7th Cir. 2017).

[122] *Id*. at 869.

[123] *Id*. at 870.

[124] *Id*.

[125] *Pac. Emp'rs Ins. Co. v. Wausau Bus. Ins. Co*., No. 3:05-cv-850-J-32TEM, 2007 WL 2900452, at *8 (M.D. Fla. Oct. 2, 2007).

[126] *Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 78 (1st Cir. 1009) (citation omitted).

including the provision of workers' compensation insurance and other required insurance.  In turn, the SSA required that Jake's pay Lone Star a monthly fee in addition to the amount of gross wages and all employer contributions.  Although use of the term "lease" in the controlling agreement is not determinative of whether an entity is a "labor leasing firm,"[127] Jake's own corporate representative testified that Lone Star was formed to "lease out the employees" to Marietta entities, and that function is Lone Star's only business.[128]  Under these facts, a reasonable insured would understand an exclusion for bodily injury to "employees," including "leased workers," to include workers employed by Lone Star and leased to Jake's, particularly given that Jake's has no employees of its own.  Jake's lacks support for its argument that Lone Star cannot be a "labor leasing firm" because it only leased employees to businesses affiliated with the Marietta family.

Finally, Jake's briefly suggests that Harper may have been a "temporary worker" and therefore not Jake's "employee," but fails to develop this argument with case law or factual support.  It is undisputed that Harper worked for Jake's for several years prior to Lone Star's formation, and that after Lone Star was created in 2011, he was employed by Lone Star and leased to Jake's on a continuous basis until the time of his injury in 2014.  Although Harper's job tasks may have varied from season to season, there is nothing in the record to suggest that Harper's work for Jake's was short-term or temporary.  The Court finds that Lone Star qualifies as a "labor leasing firm," and that Harper qualifies as a "leased worker" and therefore Jake's "employee," within the meaning of the Everest Policy.

---

[127] *See id.*

[128] Baker Dep., Doc. 20-4 at 32:21−24.

### 2.      Did Harper's Injury Arise Out of and in the Course of Performing Duties Related to the Conduct of Jake's Business?

The EL Endorsement provides that there is no coverage for bodily injury to an employee "arising out of and in the course of . . . performing duties related to the conduct of Jake's business."[129]  Jake's and Harper contend that the Court should abstain from ruling on whether Harper was performing work related to the conduct of Jake's business at the time of his injury because that question is still in play in the State Court Action.  The Court has already addressed, and therefore briefly disposes of, this argument.

Shortly after Everest moved for summary judgment in this case, Jake's and Harper moved for a stay pending resolution of the underlying State Court Action.  In the State Court Action, Jake's is arguing, as an affirmative defense, that the "exclusive remedy" provision of the Kansas Worker's Compensation Act ("KWCA") applies to bar Harper's tort claims against it because Jake's was Harper's "statutory employer" within the meaning of that statute.  The judge in the State Court Action denied Jake's motion for summary judgment based on this affirmative defense, finding that genuine disputes of material fact remained.[130]

In this action, then, Jake's and Harper argued in their motions to stay that factual issues with respect to Jake's liability-determinative exclusive-remedy affirmative defense in the State Court Action would overlap with the question of Harper's employment status in this action and, therefore, that a determination by this Court of whether the Everest Policy's EL Endorsement applies would encroach on the state court's jurisdiction.

---

[129] Doc. 20-1 at 71.  Jake's contends that Everest is estopped from arguing against coverage on the basis of Section 1(a) of the EL Endorsement (pertaining to injury arising out of or in the course of employment or retention by or for Jake's) because Everest did not raise that precise provision in its ROR letter; Everest does not directly address this argument, but focuses instead on Section 1(b) (pertaining to injury arising out of or in the course of performing duties related to the conduct of Jake's business) in arguing that coverage is precluded.

[130] Doc. 107-1.

Under the KWCA's exclusive-remedy provision, "a worker may not maintain a common-law negligence action against an employer if the worker may recover benefits for an injury from that employer under the Act."[131]   K.S.A. § 44-503(a) provides that the KWCA "extends . . . to certain individuals or entities who are not the immediate employers of the injured workers, but rather are 'statutory employees.'"[132]   The effect of this provision is

> to allow an employee of a contractor to recover workers compensation benefits from either his immediate employer or the principal contractor, so long as the work being done by the employee is either an integral part of the principal's trade or business or is work that would ordinarily have been done by an employee of the principal.[133]

"A statutory employer is immune from a common-law suit for damages due to the exclusive remedy provision even when the injured employee chooses to receive workers compensation benefits from his or her immediate employer rather than the statutory employer because the employee could have recovered compensation from the statutory employer."[134]

As set forth in this Court's April 27, 2020 Memorandum and Order, a Crawford County jury will have to determine whether, according to the Kansas Supreme Court's so-called "*Hanna* tests*,*" Jake's qualifies as Harper's statutory employer within the meaning of the KCWA by deciding: (1) whether similar businesses use their own employees to perform the kind of work that Harper was doing at the time of his injury; or (2) whether Jake's would normally do the work Harper was performing at the time of his injury through its own employees.[135]   In contrast,

---

[131] *Bright v. Cargill, Inc*., 837 P.2d 348, 355 (Kan. 1992) (citing *Zehring v. Wickham*, 658 P.2d 1004, 1006 (Kan. 1983)); K.S.A. § 44-501(d).

[132] *Robinett v. Haskell Co*., 12 P.3d 411, 414 (Kan. 2000) (citing *Bright*, 837 P.2d 348, 355−56); K.S.A.   § 44-503(a).

[133] *Robinett*, 12 P.3d at 415 (citation omitted).

[134] *Id*. (first citing *Bright*, 837 P.2d at 355−56; then citing *Zehring*, 658 P.2d at 1006).

[135] *Bright*, 837 P.2d at 356 (clarifying *Hanna v. CRA, Inc*., 409 P.2d 786, 789 (Kan. 1966)); *Stottlemyre v. Sunflower Elec. Power Corp*., 107 F. Supp. 3d 1182, 1188−89 (D. Kan. 2015) (applying "*Hanna* test").

this case involves the broader question of whether Harper's injury "[arose] out of and in the course of . . . performing duties related to the conduct of Jake's business."[136]

In arguing that the Court should refrain from ruling on the nature of the work Harper was performing at the time of his injury because that question is for the state court to decide, Jake's and Harper ignore the fact that the *Hanna* tests do not apply in determining whether the EL Endorsement bars coverage. While it certainly could be said that if the *Hanna* tests are satisfied—as Jake's is expressly arguing they are in the State Court Action—then the broader EL Endorsement would also apply, "an employer's liability exclusion for bodily injury to an employee 'arising out of and in the course of employment' encompasses claims that are potentially broader than workers' compensation obligation and may only have a limited causal relationship to employment."[137] The Court declines to alter its prior ruling on this issue and will proceed to construe the EL Endorsement on the facts of this case.

The Kansas Supreme Court has stated that "[t]he terms 'arising out of' and 'in the course of' . . . employment have, by judicial [decision], acquired definite meanings which are generally recognized."[138]

> The term "in the course of" employment . . . relates to the time, place and circumstances under which the accident occurred, and means the injury happened while the workman was at work in his employer's service. If personal injury by accident befalls a workman while he is doing what a man so employed may reasonably do within a time during which he is employed, and at a

---

[136] Doc. 20-1 at 71.

[137] *Scottsdale Ins. Co. v. GFM Operations, Inc.*, 789 F. Supp. 2d 1278, 1288 (S.D. Fla. 2011) (quoting *Sinni v. Scottsdale Ins. Co.*, 676 F. Supp. 2d 1319, 1333 (M.D. Fla. 2009)); *see also Ohio Cas. Ins. Co. v. Garden of Eat'n of Tampa, Inc.*, No. 8:10-cv-2602-T-33TBM, 2011 WL 3879512, at *6–7 (M.D. Fla. Sept. 2, 2011) (noting that employer's liability exclusion may apply to bar coverage regardless of whether injury creates obligation under worker's compensation statute).

[138] *Bienz v. John Hancock Mut. Life Ins. Co.*, 407 P.2d 222, 225 (Kan. 1965). The court stated that when those terms are used in an insurance policy, "we see no reason to doubt that they were intended to have the same meaning which they have in our Workmen's Compensation Act." *Id.*

place where he may reasonably be during that time, the injury
occurs "in the course of" employment.

The term "arising out of" employment . . . points to the cause or
origin of the accident and requires some casual connection
between the injury and the employment.  An injury arises out of
employment if it arises out of the nature, conditions, obligations or
incidents of employment.[139]

Under Kansas law, the phrase "arising out of," when used in insurance contracts, requires "more

than a remote connection."[140]  However, the phrase denotes a more liberal standard than

proximate cause, and is a "broad and inclusive" concept.[141]   Similarly, "[t]he words 'relate' or

'related' are commonly understood terms in everyday usage.  They are defined in the dictionary

as meaning a 'logical or causal connection between' two events."[142]

Considering the foregoing definitions and the facts of this case, the Court finds that there

is no genuine dispute of material fact regarding whether Harper's bodily injury arose out of and

in the course of performing duties related to Jake's business.  In August 2014, Harper was

assisting in preparing the Bypass Property for sub-leasing.  As the lessee of the Bypass Property,

Jake's was solely responsible for readying it for the new tenant.  This project involved Harper

and his co-worker taking inventory of storage trailers on the property to determine what

materials Jake's could salvage for use in its business.  On the day of the injury, Harper and his

co-worker were in the process of removing expired fireworks from a storage trailer; Jake's

owned the expired fireworks, the trailer, and the forklift Harper's co-worker was operating when

---

[139] *Id.* (quoting *Pinkston v. Rice Motor Co.*, 303 P.2d 197, 203 (Kan. 1956)); *see also Kindel v. Ferco Rental, Inc.*, 899 P.2d 1058, 1063 (Kan. 1995).

[140] *Dillon Cos., Inc. v. Royal Indem. Co.*, 369 F. Supp. 2d 1277, 1288 (D. Kan. 2005) (citing *Farm Bureau Mut. Ins. Co., Inc. v. Evans*, 637 P.2d 491, 494 (Kan. Ct. App. 1981)).

[141] *Id.* (citation omitted).

[142] *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1262 (11th Cir. 2000) (citing Webster's Third New International Dictionary (1981)).

the explosion occurred.  Although Harper argues that the work he was performing was "property management outside and apart from the fireworks distribution business,"[143] the circumstances here support that regardless of whether the narrower *Hanna* tests are satisfied, Harper was injured at a time, place, and under circumstances in which he was performing tasks related to Jake's business, including the cleanup and salvage of fireworks.  The EL Endorsement therefore applies to bar coverage for the State Court Action, and because Jake's lacks coverage under the Everest Policy, it also lacks coverage under the Maxum and James River Policies.

### E.      Does Jake's Have Coverage Under the Everest Policy's Stop-Gap Endorsement?

Jake's and Harper argue that despite the EL Endorsement, Jake's has coverage under the Everest Policy's Stop-Gap Endorsement, which provides, in part, that Everest will cover

> sums that the insured becomes legally obligated to pay as damages because of "bodily injury" to any of your "employees" that arises out of and in the course of employment by you, provided such "employee" is reported and declared under the Workers Compensation Fund of a state designated in the Schedule of this endorsement.[144]

The Stop-Gap Endorsement also provides that it applies where Jake's "legal liability is in lieu of or in addition to the liability under an applicable 'Workers' Compensation Law.'"[145]

Jake's and Harper contend that the insurers have conceded that Harper qualifies as Jake's "employee" and that his bodily injury arose out of and in the course of performing duties related to Jake's business through their arguments pertaining to the EL Endorsement, and that the only remaining requirement for Stop-Gap Endorsement to apply is that Harper was "reported and declared under the Workers Compensation Fund of a state designated in the Schedule of this

---

[143] Doc. 63 at 16.

[144] Doc. 20-1 at 67.

[145] *Id.*

endorsement."[146]  Jake's and Harper contend, however, that Everest failed to make this reporting requirement clear—they argue that the Stop-Gap Endorsement is ambiguous and must be construed in favor of coverage because Everest did not fill in the blank where it could have required reporting to a workers' compensation fund of a particular state or states, failed to designate any specific state in the Schedule of the Stop-Gap Endorsement, and did not explain what is meant by the phrase "reported and declared."

The insurers counter first that Jake's has waived the argument that the Stop-Gap Endorsement provides coverage because Jake's did not raise this provision in its pleadings prior opposing Everest's motion for summary judgment.  The insurers further argue that the Stop-Gap Endorsement has no application here because it does not apply to workers in Kansas, Harper has not been reported or declared to any workers' compensation fund in Kansas or elsewhere, Jake's liability to Harper is not in lieu of or in addition to its liability under applicable workers' compensation laws, and Jake's and Harper's interpretation of the Stop-Gap Endorsement must be rejected as unreasonable.

The insurers explain their argument that the Stop-Gap Endorsement cannot apply here by providing background on the purpose of such provisions.  They point out that

> [e]mployer's liability coverage is traditionally written in conjunction with workers' compensation insurance and is intended to fill gaps by providing protection in those situations in which [the] employee has [the] right to bring [a] tort action despite provisions of [the] workers' compensation statute, or [where the] employee is not subject to workers' compensation law, and generally these two types of coverage are mutually exclusive.[147]

---

[146] *Id.*

[147] 16 Couch on Ins. § 225:157 n.2 (3d Ed. June 2020 Update); *see also Erie Ins. Prop. & Cas. Co. v. Stage Show Pizza, JTS, Inc.*, 553 S.E.2d 257, 262 (W. Va. 2001) (citing 1 Appleman on Insurance § 1.17 (2d Ed. 1996)).

The insurers argue that in most states, workers' compensation insurance is sold by private insurers; in several so-called "monopolistic" states, however, employers are required to purchase workers' compensation coverage directly from a state fund.[148]  They state that because state workers' compensation funds do not provide coverage for employer's liability, an insured in a monopolistic state will typically purchase a stop-gap endorsement to its workers' compensation or commercial general-liability policy. The insurers argue that stop-gap coverage does not apply in a non-monopolistic state such as Kansas, and that this explains why Kansas courts have not interpreted such provisions.[149]  They hypothesize that "Jake's undoubtedly purchased Stop Gap coverage with its Everest Policy to ensure that it had employer's liability coverage for workers in Washington, a monopolistic state in which it has operations."[150]

Regardless of whether stop-gap employer's liability provisions may apply in Kansas under circumstances not present here, the Court finds that even if Jake's has not waived this argument, it has failed to meet its burden to prove coverage under the Stop-Gap Endorsement of the Everest Policy on the facts of this case.  Jake's and Harper argue that a reasonably prudent insured would understand stop-gap coverage to apply in all states because the Stop-Gap Endorsement itself does not identify any particular state, and because the Everest Policy's Commercial General Coverage Part Schedule and Final Audit state that the provision's coverage location is "ALL."[151]  In focusing on where the endorsement applies, however, Jake's and Harper ignore how it applies.

---

[148] *See* 4 Compensation and Benefits § 44:123 (Nov. 2020 Update).

[149] *See Muncy v. Criswell*, No. 3:07-0563, 2008 WL 11379931, at *1 (S.D. W. Va. July 16, 2008) (finding that commercial general-liability policy provision providing employer's liability coverage only applied to monopolistic states, not competitive-fund states).

[150] Doc. 112 at 32.

[151] Doc. 20-1 at 19, 72.

The Stop-Gap Endorsement expressly states that it applies where the injured worker is "reported and declared under the Workers Compensation Fund of a state designated in the Schedule of this endorsement."[152]  In the Coverage Part Schedule and Final Audit, the coverage location is listed as "ALL" for this provision, meaning that Harper could have been reported and declared in any state that has such a fund.  However, there is no evidence in this case that Harper was reported or declared to any workers' compensation fund, which is logical because while Harper was employed and injured in Kansas, the Kansas Workers' Compensation Fund is only liable under limited circumstances that do not appear applicable here.[153]  Jake's contention that the Stop Gap Endorsement applies in *all* states actually supports the insurers' argument that Harper could have been reported to *any* applicable workers' compensation fund but was not.

The Court also cannot credit Jake's argument that the phrase "reported or declared" is ambiguous.  Failing to define a contract term does not, under Kansas law, automatically render it ambiguous,[154] and the Court finds that according to its plain meaning, that phrase requires that Harper's "employer must have made known that he would collect benefits from [a workers' compensation] fund."[155]  Nor does the Court credit Jake's argument that the insurers are

---

[152] *Id*. at 67.

[153] *See* K.S.A. § 44-566a(e) (providing that Kansas Workers' Compensation Fund shall be liable for payment of (1) awards to handicapped employees for claims arising prior to July 1, 1994; (2) benefits to an employee whose employer is uninsured or insufficiently self-insured; (2) reimbursement of an employer or insurance carrier for amounts paid in excess of the award ordered in a full hearing on the workers' compensation claim; (4) payment of the actual expenses of the commissioner of insurance incurred for administering the fund; and (5) other payments or disbursements provided by law).  Further, in cases where the Kansas Workers' Compensation fund may be available, "the commissioner . . . shall be impleaded in such proceedings and shall represent and defend the workers compensation fund."  K.S.A. § 44-566a(c)(1).  The only parties to Harper's workers' compensation action were Harper, Lone Star, and TIC.  *See* Doc. 83-1, Ex. A.

[154] *See Speth v. State Farm Fire & Cas. Co*., 35 P.3d 860, 862 (Kan. 2001).

[155] *Caliber One Indem. Co. v. O & M Constr. Co*., No. 1:04-CV-00417-LJM-VS, 2004 WL 2538646, at *4 (S.D. Ind. Sept. 29, 2004) (adding that "the words 'reported' and 'declared' are common English words and should be given their plain meaning"); *but see Quality Signs & Serv., Inc. v. Westfield Cos., Inc*., No. 02-Cl-1396, 2004 WL 1047914, at *3 (Ky. Cir. Ct. Feb. 16, 2004) (finding term "reported and declared" ambiguous when "buried in a lengthy, highly technical provision").

estopped from denying coverage under the Stop-Gap Endorsement—Jake's has the burden to prove that coverage under this provision exists, and "waiver and estoppel will not expand a policy's coverage."[156]  Finally, Jake's interpretation of the Stop-Gap Endorsement would render the EL Endorsement meaningless, which is not a result favored by Kansas law.[157]  Having found that Jake's has failed to meet its burden of establish coverage under the Stop-Gap Endorsement because it has not shown that Harper was "reported and declared" under the workers' compensation fund of any state, the Court does not reach the insurers' additional argument that Jake's cannot show that its liability in the State Court action "is in lieu of or in addition to" liability under an applicable workers' compensation law.

## F. Do Defendants' Affirmative Defenses Preclude Summary Judgment in the Insurers' Favor?

The Court has not decided this case based on any interpretation of the EL Endorsement that is subject to the parties' competing waiver and estoppel arguments, and therefore will not further address Jake's motion for leave to file a sur-reply on these issues and its objections to Judge Mitchell's order denying it leave to amend its answers and counterclaims as to Everest and Maxum to assert estoppel as a defense.[158]  Further, as noted above, the Court need not consider

---

[156] *Ashton v. Nat'l Farmers Unions Prop. & Cas. Co.*, No. 11-4002-SAC, 2012 WL 2814129, at *7 (D. Kan. July 10, 2012) (quoting *Russell v. Farmers Ins. Co., Inc.*, 163 P.3d 1266, 1268−69 (Kan. Ct. App. 2007)).

[157] *See LDF Food Grp., Inc. v. Liberty Mut. Fire Ins. Co.*, 146 P.3d 1088, 1095 (Kan. Ct. App. 2006); *Dillard Dept. Stores, Inc. v. State, Dept. of Human Res.*, 13 P.3d 358, 364 (Kan. Ct. App. 2000).

[158] The Court is not persuaded by Jake's argument that James River is estopped from denying coverage on any basis whatsoever because it did not decline coverage until June 2020.  "Kansas courts recognize that estoppel may arise from an insurer's failure to make a timely and proper reservation of rights . . . [i]f a liability insurer, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights."  *Lone Star Steakhouse & Saloon, Inc. v. Liberty Mut. Ins. Grp.*, 343 F. Supp. 2d 989, 1009 (D. Kan. 2004) (quoting *Snedker v. Derby Oil Co.*, 192 P.2d 135, 137 (Kan. 1948)).  Jake's does not argue that James River, the second-level excess insurer, played any role in Jake's defense in the State Court Action, nor has Jake's established that James River's "acts, representations, admissions, or silence" induced it to believe that coverage existed despite the fact that Everest has been defending Jake's in the State Court Action under a reservation of rights that includes the basis on which this case is decided in the insurers' favor.  *Id.* at 1010.

whether Jake's has waived its Stop-Gap Endorsement argument because, even if it has not, Jake's has failed to meet its burden to show that the Stop-Gap Endorsement provides coverage for the State Court Action.  Jake's motion for leave to file a sur-reply and its objections to Judge Mitchell's order are denied as moot given the findings set forth above.  In opposition to Everest's motion for summary judgment, Harper raises additional affirmative defenses—specifically, multiple abstention doctrines, collateral estoppel on the issue of Harper's employment status, laches, and collusive joinder.  The Court finds that none of these defenses prevent judgment in the insurers' favor.

In seeking summary judgment on its claim for declaratory judgment, Everest "is necessarily also moving for summary judgment on any affirmative defenses to that claim."[159]  In response, "a defendant that wishes to prevent entry of summary judgment on the claim [must] come forward with evidence showing the existence of a genuine factual dispute concerning an affirmative defense that, if ultimately successful, would defeat the claim."[160]  If the defendant fails to do so and summary judgment in the plaintiff's favor is otherwise warranted, "then the affirmative defense is extinguished."[161]

Harper argues, again, that the Court should abstain from hearing this declaratory judgment action on the basis of the *Rooker-Feldman*, *Younger*, and *Colorado River* doctrines and collateral estoppel.  The shared premise of Harper's arguments in support of the application of each of these doctrines is that this Court should not rule on whether the nature of the work

---

[159] *United Cent. Bank v. Wells St. Apartments*, LLC, 957 F. Supp. 2d 978, 987 (E.D. Wis. 2013), *aff'd sub nom. United Cent. Bank v. KMWC 845, LLC*, 800 F.3d 307 (7th Cir. 2015).

[160] *Id*. at 987−88; *see also Int'l Sch. Servs., Inc. v. AAUG Ins. Co*., No. 10-62115-CIV, 2012 WL 5635590, at *8 (S.D. Fla. Nov. 15, 2012); *McCollough v. Johnson, Rodenberg & Lauinger*, 587 F. Supp. 2d 1170, 1176 (D. Mont. 2008), *aff'd*, 637 F.3d 939 (9th Cir. 2011).

[161] *United Cent. Bank*, 957 F. Supp. 2d at 988.

Harper was performing at the time of his injury makes Jake's his statutory employer under the *Hanna* tests because that is an issue that the state court has decided or will decide.  However, as Everest aptly notes, the Court has already ruled that it will not abstain from hearing this case because interpretation of the EL Endorsement does not decide the narrower statutory-employer question in the State Court Action.  In deciding this insurance-coverage declaratory judgment action, the Court has not ruled on whether the *Hanna* tests are satisfied.[162]

Further, the *Rooker-Feldman* doctrine cannot apply here for the additional reason that the state court proceedings are not final.[163]  The *Younger* abstention doctrine does not apply because although Harper argues that the State Court Action is a civil proceeding that implicates the State of Kansas's interest in enforcing the orders and judgments of its courts, he cites no persuasive authority to support that his state tort action meets this definition.[164]  Finally, the *Colorado River* abstention doctrine only applies where there are "parallel" state and federal proceedings, meaning that "the same parties litigate substantially the same issues in different forums."[165]

> [T]o grant a stay or dismissal under the *Colorado River* doctrine would be "a serious abuse of discretion" unless "the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. . . .  [T]he decision to invoke *Colorado River* necessarily contemplates that

---

[162] *See* Doc. 49 at 7−8 (stating that the issues presented in this action are neither dependent on nor interfere with Jake's statutory-employer affirmative defense in the State Court Action); *see also, e.g., Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253, 1267 (10th Cir. 2002) (stating that *Younger* abstention only applies where federal proceedings will "interfere with an ongoing state judicial proceeding") (citing *J.B. v. Valdez*, 186 F.3d 1280, 1291 (10th Cir. 1999))).

[163] *See Guttman v. Kahlsa*, 446 F.3d 1027, 1032 (10th Cir. 2006) (collecting cases); *Farris v. Burton*, Case No. 15-1286-EFM-GLR, 2016 WL 4015032, at *3 (D. Kan. July 27, 2016).

[164] *See, e.g., Sprint Commc'ns v. Jacobs*, 571 U.S. 69, 72−73 (2013) (stating that although *Younger* abstention has been extended to state civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts," cases that fit within the doctrine are "exceptional" and courts should "ordinarily . . . entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not 'refuse[e] to decide a case in deference to the States'") (alteration in original) (citations omitted)).

[165] *Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994) (quoting *New Beckley Mining Corp. v. Int'l Union, UMWA*, 946 F.2d 1072, 1073 (4th Cir. 1991)).

> the federal court will have nothing further to do in resolving any
> substantive part of the case whether it stays or dismisses."[166]

As set forth in this and a prior order, this declaratory judgment action and the State Court Action are not parallel—the state court will not determine insurance coverage under the Everest Policy, and this action does not determine the application of the KWCA's exclusive-remedy defense.

Harper's argument that collateral estoppel prevents re-litigation of his "employment status" fails for the same reason.[167]  Under Kansas law, collateral estoppel first requires "a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment."[168]  The "issue" in this case and in the "issue" in the State Court Action are not the same, nor has there been a final judgment on the merits in the State Court Action.  Further, collateral estoppel requires the parties to be the same or in privity,[169] yet Harper's contention that Everest is in privity with Jake's because it provided Jake's state-court defense under a reservation of rights appears contrary to Kansas law.[170]

Harper also argues that the affirmative defense of laches precludes summary judgment in the insurers' favor.  The doctrine of laches "is an equitable device designed to bar stale claims."[171]  While courts may look unfavorably on claims asserted after a lengthy passage of time, "[d]elay, by itself, . . . does not constitute laches and an action generally will not be

---

[166] *Id.* (second alteration in original) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 360 U.S. 1, 28 (1983)).

[167] Doc. 63 at 20.

[168] *In re City of Wichita*, 86 P.3d 513, 526 (Kan. 2004) (emphasis added) (quoting *Waterview Resolution Corp. v. Allen*, 58 P.3d 1284, 1290 (Kan. 2002)); *see also Tholen Supply Co., Inc. v. Cont'l Cas. Co.*, No. 93-2224-JWL, 1998 WL 259898, at *1−2 (D. Kan. Apr. 15, 1998).

[169] *In re City of Wichita*, 86 P.3d at 526 (citation omitted).

[170] *See Davin v. Athletic Club of Overland Park*, 96 P.3d 687, 691 (Kan. Ct. App. 2004) (finding privity between insured and insurer severed where insurer hired attorney to defend insured under a reservation of rights).

[171] *United Cities Gas Co. v. Brock Exploration Co.*, 995 F. Supp. 1284, 1298 (D. Kan. 1998).

defeated by laches alone unless some prejudice has resulted therefrom to the rights or interests of the adverse party."[172]  In determining whether the defense applies, "the court must consider the totality of the circumstances surrounding the filing of the lawsuit."[173]

     Harper's only argument to support that he has been prejudiced here is that Everest "allowed over three years of significant litigation to go forward before [it] sprung the present action disclaiming coverage for Harper's serious, lifelong injuries."[174]  Harper does not explain, however, how Everest seeking a declaratory judgment sooner on the coverage issue would have avoided Harper's drawn-out litigation with Jake's in the State Court Action, and other courts have found that the laches doctrine does not prevent an insurer from seeking declaratory judgment on coverage while defending the insured under a reservation of rights.[175]  Harper has not established that Everest failed to assert its rights for an unreasonable length of time or in a manner that caused him prejudice.

     Finally, Harper argues—in one paragraph and without citation to case law—that Jake's and Everest have "an identical interest . . . in any determination that Harper was an employee of Jake's at the time Harper was injured," and that Everest collusively joined both Jake's and

---

[172] *Id.* (quoting *Cosgrove v. Young*, 642 P.2d 75, 86 (Kan. 1982)).

[173] *Id.* (citing *Gillespie v. Seymour*, 823 P.2d 782, 792 (Kan. 1991)).

[174] Doc. 63 at 21.

[175] *See, e.g., Mut. Benefit Ins. Co. v. R. Gates Constr. Co., Inc.*, No. RDB-20-0069, 2020 WL 5798069, at *2 (D. Md. Sept. 29, 2020) (stating that where insurer seeks declaratory relief while defending insured under reservation of rights, defense of laches is inapplicable); *Firemen's Ins. Co. of Washington D.C. v. Glen-Tree Invs., LLC*, No. 7:11-CV-59-D, 2012 WL 4191383, at *8 (E.D.N.C. Sept. 19, 2012) ("Adequate notice of an insurer's reservation of rights generally precludes an insured from alleging prejudice from the insurer's subsequent denial of coverage.") (collecting cases)); *Hartford Fire Ins. Co. v. Gandy Dancer, LLC*, No. CIV 10-0137 JB/RHS, 2011 WL 1336523, at *20 n.6 (D.N.M. Mar. 30, 2011) (finding no laches where insured was on notice, through insurer's reservation of rights, that insurer would seek declaratory relief); *Am. Fam. Ins. Co. v. Chamunda Inc.*, No. 23524, 2008 WL 1808335, at *3−4 (Ohio Ct. App. Apr. 23, 2008) (finding laches not applicable where, before undertaking defense of suit, insurer sent reservation of rights letter contesting coverage and stating intent to offer defense only until its rights could be determined).

Harper as party defendants in this case to establish diversity jurisdiction.[176]  Harper contends that "this collusive joinder requires that Jake's be designated as a plaintiff along with Everest and deprives this Court of diversity jurisdiction."[177]  This argument is unavailing.

"This Circuit has held that 'courts will scrutinize the interests of the parties in order to determine if their positions as plaintiffs and defendants conform to their real interests.'"[178] "When appropriate, parties will be realigned; however, this is to be done only after real rather than apparent interests have been ascertained,"[179] and "is proper if the Court determines that no actual, substantial controversy exists between the relevant parties."[180]

Harper ignores the fact that in this action, Everest seeks a judgment that its policy provides no coverage for his injury, while Jake's seeks a judgment precisely to the contrary. Harper fails to explain how this scenario results in Jake's and Everest having an "identical interest," rather than directly opposed interests, in whether the Everest Policy's EL Endorsement applies to bar coverage for Harper's injury and whether the Stop-Gap Endorsement provides coverage, which are the issues before this Court.  Harper has not shown the existence of a genuine factual dispute concerning any affirmative defense that, if ultimately successful, would defeat Everest's claim for declaratory judgment.

---

[176] Doc. 63 at 22.

[177] *Id.*

[178] *Smith v. City of Wellsville, Kan.*, No. 19-2431-JWB-KGG, 2020 WL 6544585, at *4 (D. Kan. Nov. 6, 2020) (citing *Farmers Alliance Mut. Ins. Co. v. Jones*, 570 F.2d 1384, 1387 (10th Cir. 1978)).

[179] *Id.*

[180] *Martinez v. City of Santa Fe*, No. 14-cv-0016-SMV/KBM, 2014 WL 12495375, at *2 (D.N.M. Apr. 4, 2014) (citing *Price v. Wolford*, 608 F.3d 698, 705 (10th Cir. 2010)).

**IT IS THEREFORE ORDERED BY THE COURT** that Everest's Motion for Summary Judgment (Doc. 19), Maxum's Motion for Summary Judgment (Doc. 92), and James River's Motion for Summary Judgment (Doc. 87) are **granted**, and the Court shall enter declaratory judgment that the Everest, Maxum, and James River Policies do not provide liability coverage for Harper's bodily injury claim and lawsuit filed against Jake's in the District Court of Crawford County, Kansas.  Jake's Motion for Summary Judgment (Doc. 90) and Harper's Motion for Summary Judgment (Doc. 95) are **denied.**

**IT IS FURTHER ORDERED** that Jake's Motion for Leave to File a Sur-Reply to Plaintiff Everest Indemnity Company's Reply in Support of its Motion for Summary Judgment (Doc. 94) and Jake's Objections to the Magistrate Judge's Order Denying Jake's Motion for Leave to Amend its Currently Pending Amended Answer and Counter-Claim to Plaintiff Everest's Complaint for Declaratory Judgment and Motion for Leave to Amend its Amended Answer and Counter-Claim to Intervenor Plaintiff Maxum Indemnity Company's Complaint for Declaratory Judgment (Doc. 100) are **denied as moot.**

**IT IS SO ORDERED.**

Dated: November 19, 2020

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE